UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JOSEPH DARLING, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 6-123-B-W |
| | ) | |
| INDYMAC BANCORP, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## RECOMMENDED DECISION

Joseph and Roxanne Darling are suing Western Thrift & Loan[1], a mortgage broker, under the federal Truth in Lending Act, 15 U.S.C. § 1601 (TILA) and Regulation Z, 12 C.F.R. § 266, alleging that Western Thrift failed to provide the proper required written disclosures to them prior to the closing of the Darlings' mortgage with the lender, IndyMac Bank, and misrepresented the terms of the loan to induce a closing.  In addition to their TILA claim, the Darlings allege a violation of Maine's Unfair and Deceptive Trade Practice Act, breach of fiduciary duty, fraud, negligent misrepresentation, and "malice."  Western Thrift has filed a motion for summary judgment or, in the alternative, for partial summary judgment.  I recommend that the Court grant the motion only as to the TILA claim asserted in count I, and retain supplemental jurisdiction over the remaining state law claims.

## FACTS

The following facts are material to the motion for summary judgment. The facts are drawn from the parties' statements of material facts filed in accordance with Local Rule 56.  <u>See</u>

---

[1]     Paul Mikhail, the mortgage broker agent employed by Western Thrift, and IndyMac Bank F.S.B. are no longer party defendants to this action.  According to paragraph four of the second amended complaint, Western Thrift has agreed that it is legally responsible for any actions/omissions on the part of Mikhail, if any are found to exist, but Western Thrift denies the truth of that allegation in paragraph four of its answer.  Neither the summary judgment record nor the memoranda address this issue.

Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining the mandatory procedure for establishing factual predicates needed to support or overcome a summary judgment motion); Toomey v. Unum Life Ins. Co., 324 F. Supp. 2d 220, 221 n.1 (D. Me. 2004) (explaining "the spirit and purpose" of Local Rule 56).  Factual disputes have been resolved in favor of the non-movants, the Darlings, and the recitation of a "fact" herein does not mean that it is undisputed by Western Thrift.

During the early part of 2005 Joseph and Roxanne Darling became interested in exploring various financial opportunities, including the possibility of refinancing their primary residence in West Gardiner, Maine, which they had built approximately three years earlier. Joseph Darling has no formal education past high school.  Roxanne Darling attended college briefly, but never obtained any post-high school degree.   (Non-Movants' Statement (NMS) ¶ 73, Doc. No. 52.)[2]  Joseph Darling had some knowledge about adjustable rate mortgages and "stuff like that."  (Id. ¶ 67.)   Joseph Darling knew that the stock market and interest rates were "uneasy" at the time.  (Id. ¶ 68.)  Joseph Darling educated himself about banks, lending, interest rates, and refinancing. (Movant's Statement (MS) ¶ 69, Doc. No. 46.)

In approximately January of 2005, the Darlings were introduced to Paul Mikhail through a third-party, Albert Myer, who belonged to what the Darlings believed to be an educational program[3] called "Pinnacle Quest."  (NMS ¶ 74.)   Myer advised that a variety of mortgage and other financial products were available that were far more favorable than generally existed in the

---

[2]    Plaintiffs began their additional statement of material facts at consecutive paragraph number 73, following the defendants' first 72 paragraphs.  However, defendants also filed a supplemental paragraph 73 (See Doc. No. 49.) For the sake of clarity I have retained plaintiffs' numbering system.  Defendants request the first sentence of paragraph 73 be stricken. The sentence reads "Plaintiffs are unsophisticated in financial matters."  Although I disagree with defendants that it should be stricken because it contradicts prior deposition testimony, I am nevertheless not including it because it is a conclusory statement.  The facts will speak for themselves.
[3]    Although neither party exactly spells this out in their statements of material facts, Pinnacle Quest appears to have been an entity that held seminars at exotic locations promising educational materials about the latest "good investment opportunities" and other current topics.

marketplace, if you knew where to find them.  Myer advised that a fellow named Paul Mikhail was "doing wonders" with a one-percent mortgage and recommended that they contact Mikhail. (Id. ¶ 75.)  The Darlings were interested in the one-percent loan program because they wanted to pay off their home more quickly than under their existing loan, take money out of their house to refinish their daylight basement, and become members of Pinnacle Quest.  (Id. ¶ 76.)

In February of 2005, Joseph and Roxanne Darling contacted Western Thrift & Loan and Paul Mikhail to inquire about a mortgage loan.  (MS ¶ 1.)  Neither Western nor Mikhail unilaterally approached the Darlings regarding this loan.  In fact, it was only after the Darlings were told about Mikhail by Al Myer that they began conversing with Western and Mikhail about loan options.  (Id. ¶ 57.)  Mikhail spent a number of hours with the Darlings on the telephone discussing loan options and described them as "great clients."  (Id. ¶ 58.)  Mikhail never met the Darlings in person until approximately a year after the loan closed. (Id. ¶ 59.)

Mikhail initially reviewed the Darlings' credit score to ascertain whether they would qualify for the one-percent loan program.  (NMS ¶ 77.)  Mikhail called the Darlings back and advised them that: (a) they qualified for the one-percent loan program; (b) the one-percent loan would remain fixed for one year and then would likely adjust no more than "one tenth of a percent" per year; (c) the Darlings could take $75,000 cash out of the contemplated refinance transaction and pay off their loan at $800 a month in 10 to 12 years according to his calculations. (Id. ¶ 78.)  At the time the Darlings entered into their loan transaction, they were "scrambling for the lowest interest rate" and hoped to use a portion of the $75,000.00 in loan proceeds to purchase their Pinnacle Quest membership and the remainder to complete some renovations to their home.  They were looking for the lowest interest rate to shorten the term of their loan and to keep their monthly payments in the $800.00 range.  (MS ¶ 7;  NMS ¶ 7.)  Ultimately, the

3

Darlings used at least $24,000 of the cash they received from their loan with IndyMac Bank to pay for their membership in Pinnacle Quest, something they could not have afforded had they not refinanced their home and received cash out of the transaction.  (MS ¶ 6).  The Darlings could not have done a regular refinance in 2005 for the amount of money they borrowed.  (MS ¶ 8.)

On March 3, 2005, Mikhail conveyed to the Darlings a "preliminary" TILA Disclosure Notice for the one-percent loan which he represented that he was obtaining for them.  The Darlings understood the disclosure statement was preliminary and would change if they decided to obtain more money at the closing.  (NMS ¶ 79;  Movant's Reply Statement ¶ 79, Doc. No. 60.) The one-percent loan represented by the March 3, 2005, TILA Disclosure Notice [Exhibit 18][4] was the loan that the Darlings proceeded to believe was the loan Mikhail was obtaining for them. (NMS ¶ 80.)  The one-percent loan "disclosed" in the notice was not a form of loan that was then being offered by any lenders.  (Id. ¶ 81.)  Although the Darlings recognized that the March 3, 2005, TILA Disclosure Notice [Exhibit 18] was "preliminary" – and would change if the amount of money borrowed changed – they were advised by Mikhail and understood that they could "rely" on that notice as the final loan would look "pretty much" like the one disclosed in the March 3, 2005, notice.  (Id. ¶ 83.)[5]  The "one-percent loan" represented by Exhibit 18 called for 359 payments of $643.28 per month and a final payment (in the 360th month) of $642.89.  (Id. ¶ 84.)   The Darlings were enthusiastic about the one-percent loan represented by Exhibit 18.  (Id. ¶ 85.)

---

[4]     See Doc. No. 47-3 at 71.
[5]     Western Thrift objects to the inclusion of what Mikhail may have told the Darlings, citing the parol evidence rule.  Reliance upon the parol evidence rule is misplaced.  This evidence is not offered to alter or supplement the terms of the actual contract entered into between the Darlings and IndyMac.  The statements by Mikhail are offered based upon the theory that he misrepresented what the ultimate contract would look like.  The objection is overruled.

Over the next several months, Mikhail kept reinforcing to the Darlings that the one-percent loan would work as detailed in Exhibit 18.  Mikhail reiterated that in his experience the loan would rise no more than one-tenth of one percent per year and that the Darlings "would never even see that difference" because of the extra $200 that he was recommending that they pay per month, an amount that would allow the loan to be paid off in much less than 30 years. (Id. ¶ 86.)  Every time the Darlings questioned the loan, especially their perception that the terms seemed "too good to be true," Mikhail would "start from the beginning" and restate all of his explanations that the loan would operate essentially as detailed in Exhibit 18.  (Id. ¶ 87.)  Mikhail only discussed the one loan option with the Darlings and that was the so-called "one percent loan."  (NMS ¶ 46.)[6]

Mikhail never represented to the Darlings that this loan would remain at one percent permanently.  (MS ¶ 48.)  The Darlings clearly understood that they would not have a one percent interest rate for the life of their loan.  (Id. ¶ 49.)  Mikhail maintains he never represented that the interest rate of their loan would not change in the first year of the loan, only that the payment amount would not change during the first year.  (Id. ¶ 50.)  Consistent with Mikhail's alleged representation, the minimum payment on the mortgage with IndyMac Bank remained at approximately $856.00 for at least the first year of the loan.  (Id. ¶ 51.)

On February 9, 2005, the Darlings signed a residential loan application prepared by Mikhail using information provided to him by the Darlings.  That information included income verification.  (Id. ¶ 88.)  Prior to obtaining the final loan, the Darlings signed a Mortgage Loan Origination Agreement with Western Thrift setting forth the nature of the relationship and the compensation terms on March 3, 2005.  (Id. ¶¶ 73, 89.)  The terms of the Loan Origination

---

[6]      Western Thrift disputes Roxanne Darling's testimony that only one loan was discussed.  Mikhail says he discussed various loans with the Darlings.

Agreement appeared to deviate from earlier representations made by Mikhail.  The fact that the

Loan Origination Agreement appeared to contain very different terms from Mikhail's

representations initially alarmed the Darlings.  (Id. ¶ 90.)   However, specifically with regard to

the Loan Origination Agreement, Mikhail told the Darlings that the Agreement was "just a total

legal document" and "just legal stuff", and that they should simply sign the document.  (Id. ¶ 91.)

Mikhail's response to inquiries about the Loan Origination Agreement was the same as his

response to any discrepancies with any of the documents throughout the course of this

relationship.  The paperwork was "just legal stuff" and the Darlings should simply sign the

paperwork and "trust [him]."  (Id. ¶ 92.)  After the Darlings signed the disclosure on March 3,

2005, they decided to borrow more money than the $200,000 listed on the disclosure.  (MS ¶ 40.)

The Darlings ultimately secured a loan from IndyMac Bank in the principal amount of $266,250.

(Id. ¶ 4.)

As discussed, before the closing documents were prepared, Mikhail had provided some

"preliminary documents" to give the Darlings an "idea" of what the loan would look like,

including Exhibit 18.  This exhibit was not part of the final loan package as the amount financed

listed in the exhibit is $200,000, which clearly indicates that there is no cash out component

incorporated in the preliminary disclosure.  Roxanne Darling understood the difference between

preliminary documents and final documents, and that there were preliminary documents that

needed to be signed, but that the final set of loan documents would serve as the actual

disclosures.  (MS ¶¶ 37-39.)  However, Mikhail advised them they could rely on that notice and

that the final loan would look "pretty much" like the March 3, 2005, disclosure.  (NMS ¶ 39.)

The closing occurred on May 12, 2005, at Yankee Title (in Gardiner, Maine).  (NMS ¶

93.)  No one was present at the closing other than the Darlings and a representative of Yankee

Title.  (Id. ¶ 94.)  At the closing, the Darlings signed a number of documents including an

adjustable rate note.  (Id. ¶ 95.)  The closing documents, prepared and provided by the lender,

IndyMac Bank, contained all of the proper disclosures, including a truth in lending disclosure,

which detailed the loan terms and payoff schedule.  (Id. ¶ 66.)  The Darlings had never heard of

the lender, IndyMac bank, until the closing.  All of their dealings to the point of closing had been

with Mikhail.  (Id. ¶ 101.)  The documents presented at the closing appeared to describe a very

different loan from the one percent loan described by Mikhail that the Darlings expected to see.

(Id. ¶ 96.)  Roxanne Darling became extremely skeptical when confronted with the closing

documents and called Mikhail during the closing, seeking clarification respecting the deviations.

(Id. ¶ 98.)  Mikhail confirmed that the paperwork detailed a "one percent loan" as he had

described it throughout the prior months and as reflected in Exhibit 18, and that the Darlings "did

not understand loan paperwork," which satisfied the Darlings.  (Id. ¶ 99.)  Based on Mr.

Mikhail's representations that the loan was actually a "one percent loan" as they had previously

discussed, the Darlings signed the paperwork and closed on their loan.  In their words, "Paul

[Mikhail] said to sign it, we signed it."  (Id. ¶ 100.)

        The Darlings never really understood the role of Mikhail in the transaction other than that

he would be attempting to obtain the "best bank that would help [them] with [their] loan."  (Id. ¶

102.)  The Darlings thought that Mikhail worked for IndyMac Bank and would be paid for his

work ultimately by Pinnacle Quest.  (Id. ¶ 103.)  Western and Mikhail did not receive any money

directly from the Darlings with respect to this loan transaction.  (MS ¶ 18.)  Any money received

by Western or Mikhail with respect to the Darlings' loan transaction was disclosed to the

Darlings by IndyMac Bank in the paperwork presented at the closing.  Joseph Darling recalled

that the loan paperwork did disclose some type of broker compensation.  (Id. ¶¶ 20-21.)  The

Darlings did not understand the paperwork providing those disclosures. They maintain that Mikhail told them his fees were paid by Pinnacle Quest. (NMS ¶¶ 20-21.)

Mikhail made no representations to Joseph Darling personally, and Mr. Darling's understanding of all alleged representations by Mikhail came from what Roxanne Darling told him. (MS ¶ 22.) Joseph Darling was present during Roxanne Darling's deposition testimony and does not believe any of her testimony was inaccurate. (Id. ¶ 23.) The length of the mortgage payoff period "didn't matter" to Joseph Darling as he knew he could refinance after one year. (Id. ¶¶ 53, 64.) Joseph Darling admits he "dropped the ball" by not reading the closing documents. (Id. ¶ 55.)

Roxanne Darling understood that she and her husband were, by signing the closing documents, obtaining an adjustable rate mortgage, and that the mortgage would not stay at one percent for the life of the loan. (Id. ¶ 24.) Roxanne Darling understood that when she signed the Adjustable Rate Rider, that the document indicated that the interest rate could change as early as July 1, 2005. (Id. ¶ 25.) Roxanne Darling also understood as of the date of the closing that the language of the form meant that the interest rate could change *substantially* over the life of the loan. (Id. ¶ 26; Roxanne Darling Dep. at 79:3-80:17.) However, Roxanne Darling also testified that Mikhail repeatedly assured her that, based on his years of experience in the industry, he had never seen the interest rate go up more than one-tenth of a percentage point per year. (NMS ¶¶ 26-27; Roxanne Darling Dep. at 36:1-38:24.)

The closing documents that the Darlings signed provided that their loan was for the amount of $266,250, and must be paid in full by June 1, 2035. (Id. ¶ 33.) The closing documents also contained provisions that would change the interest rate and monthly payment and provided that the interest rate may change on the first day of July 2005 and on the first day

of every month thereafter.  (Id. ¶ 34.)   The closing documents provided for a broker compensation fee of $6,909.06 and a broker processing fee of $350 to be paid to Western.  (Id. ¶ 35.)  These documents also revealed that the loan allowed for negative amortization.  (Id. ¶ 37.)

   The day after the closing, the Darlings received a call from Yankee Title and were told to return to sign "new documents."  (Id. ¶ 104.)  The new documents consisted of a revised TILA disclosure statement and a revised good faith estimate.  It is not uncommon to sign prior disclosures at closing or even after the closing.  (Id. ¶ 105;  Movant's Reply ¶ 105.)  The documents, including the Truth in Lending Disclosure form signed the day after closing, were prepared February 4, 2005, more than three months prior to closing.  (MS ¶ 42.)  The Truth in Lending Disclosure allegedly signed by the Darlings on May 13, 2005, clearly states on its face that it "is neither a contract nor a commitment to lend."  (Id. ¶ 43.)  It is common practice within the lending industry to sign prior disclosures at closing, or even after closing, in order to ensure that the loan package is complete.  (Id. ¶ 44.)  Once again, Roxanne Darling questioned these documents and called Paul Mikhail for an explanation.  (NMS ¶ 106.)  Once again, Mikhail stated that the new documents were just "legal stuff" and, again, reaffirmed that the loan was a one percent loan like he had described since February.  (Id. ¶ 107.)

   In June of 2005, the Darlings received their first monthly statement from IndyMac Bank. (Id. ¶ 108.)  Mikhail had told the Darlings to "disregard" the IndyMac monthly statement.  (Id. ¶ 109.)[7]  Approximately three months after closing, in August of 2005, the Darlings learned that their loan was "growing" (or "negatively amortizing") and called IndyMac Bank.  (Id. ¶ 111.)  In

---

[7]     Western Thrift objects to this statement which is supported by Roxanne Darling's affidavit because they say the affidavit "clearly contradicts [her] prior deposition testimony."  It makes this same objection to any number of material facts supported by the affidavit.  I did not find any of the testimony to be in clear contradiction of deposition testimony, except for plaintiffs' paragraph 110 of their additional statement of material fact, which I have excluded from this statement of facts.  There are other slight variations between the deposition and the affidavit that would go to credibility.  I have consistently overruled this objection throughout this statement of material facts, with the one exception noted.

August 2005, Mikhail refused to return or answer the Darlings' repeated telephone calls respecting the negative amortization of their loan.  (Id. ¶ 112.)   Almost immediately after the Darlings placed their first call to IndyMac Bank regarding their discontent with this loan transaction, IndyMac offered to put them in contact with a loan officer to see if they could help. However, the Darlings refused this offer, informing IndyMac that they were "looking at different avenues." (MS ¶ 61.)  Western offered to remit a check to the Darlings in the amount of $6,989.06, the amount of compensation paid to Western by IndyMac Bank for broker services, even though the Darlings never directly paid Western or Mikhail broker fees.  (Id. ¶ 62.)

On approximately August 30, 2005, the Darlings submitted a complaint to the Maine State Office of Consumer Credit regulation, asserting complaints against Western/Mikhail respecting their mortgage loan.  (NMS ¶113.)  It was not until almost one year after closing, in April of 2006, that the Darlings attempted to exercise their three-day right of rescission.  (MS ¶ 12.)  The Darlings now wish to rescind the entire loan transaction, to keep their property and $75,000 free and clear, with no obligation whatsoever.  (Id. ¶ 14.)  More than two and a half years after signing their closing paperwork, the Darlings had not even looked into refinancing their mortgage in an attempt to secure different loan terms than those they agreed upon when they signed their contract with IndyMac Bank.  (Id. ¶ 63.)  The Darlings filed their initial complaint on October 3, 2006.  (Id. ¶ 17.)

Western Thrift does not regularly extend consumer credit – in that it acts as a mortgage broker in these transactions – and was not the person to whom the Darlings' debt was initially payable.  Western does not lend any money in such transactions but solely acts as a broker and refers the transaction to a third party wholesale lender such as IndyMac Bank.  (Id. ¶ 15.)  The Darlings understood that Western and Mikhail were not loaning them money, and that it was

IndyMac Bank that was the bank providing the funds.  (Id. ¶ 16;  NMS ¶ 16.)  This transaction was solely funded by IndyMac Bank and it is IndyMac to whom the mortgage debt is owed. (MS ¶ 72.)

The Darlings have suffered between $30,000 and $50,000 in damages as a result of the negative amortization of their mortgage debt and will likely suffer future damages as well. (NMS ¶ 56.)  The Darlings have not attempted to refinance because this lawsuit is pending.  (MS ¶ 70.)  As of September 17, 2007, the Darlings were current on their mortgage payments to IndyMac Bank.  (NMS ¶ 71.)

**DISCUSSION**

The Darlings' amended complaint recites six causes of action:

(1)     A claim under the Truth in Lending Act for improper disclosures in connection with the extension of credit;

(2)     A claim under Maine's Unfair and Deceptive Trade Practices Act;

(3)     A claim alleging breach of fiduciary duties;

(4)     A claim of fraud;

(5)     A claim of negligent misrepresentation; and

(6)     A claim of "malice."

(Second Am. Compl., Doc. No. 32.)  Western's motion for summary judgment requests an order disposing of every cause of action.

**1.     The Truth in Lending Act claim is time barred.**

The Truth in Lending Act (TILA), 15 U.S.C. §§ 1601-1667f, is a subchapter within the Consumer Credit Protection Act.  In general, the TILA requires creditors to make certain disclosures to borrowers in connection with the provision of credit.  Sullivan v. Greenwood Credit Union, 520 F.3d 70, 73 (1st Cir. 2008).   The TILA subjects creditors to civil liability

11

should they fail to make the required disclosures.  Id. at 74.   The disclosure requirements of the TILA are informed by Regulation Z, authored by the Federal Reserve Board.  Santos-Rodriguez v. Doral Mortgage Corp., 485 F.3d 12, 14 (1st Cir. 2007).

Western Thrift argues that there can be no TILA cause of action against it because it served as a broker in this credit transaction and a broker is not a creditor subject to the TILA's disclosure mandates.  (Mot. for Summ. J. at 7-9, Doc. No. 45.)  Western Thrift additionally argues that the cause of action cannot be maintained because it is barred by the TILA's one year limitation period.  (Id. at 9-10.)  The claim is clearly time barred, so judgment should enter for Defendant Western Thrift on count I regardless of whether Western Thrift is a "creditor" subject to the TILA's disclosure requirements.

The TILA's limitation provision states that "[a]ny action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation."  15 U.S.C. § 1640(e).  The limitation period commences on the date "the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of TILA violation."  Jones v. TransOhio Sav. Ass'n, 747 F.2d 1037, 1043 (6th Cir. 1984).  Equitable tolling is available.  Id.; Ramadan v. Chase Manhattan Corp., 156 F.3d 499, 504 (3d Cir. 1998); Ellis v. GMAC, 160 F.3d 703, 706 (11th Cir. 1998) (collecting cases agreeing that the TILA limitation provision is subject to equitable tolling). "The doctrine of equitable tolling suspends the running of the statute of limitations if a plaintiff, in the exercise of reasonable diligence, could not have discovered information essential to the suit."  Gonzalez v. United States, 284 F.3d 281, 291 (1st Cir. 2002).

The Darlings closed on the IndyMac loan on May 12, 2005, and commenced this civil action on October 3, 2006, just over 16 months later.  The facts reflect that the Darlings

understood as of August 2005 that their loan was negatively amortizing and that they contacted

IndyMac to express their concern at that time.  By August 30, 2005, they had submitted a

complaint to the Maine State Office of Consumer Credit regulation.  On this record, there can be

no legitimate dispute but that the Darlings had discovered the alleged fraud as of August 30,

2005, or sooner.  Their TILA cause of action is time barred even if the Court assumes that

Western, as a broker, is a creditor subject to the TILA's disclosure requirements.[8]

2.      **Genuine issues of material fact exist on all of the supplemental state law claims.**

The factual core of this case is that the Darlings allegedly relied on false representations

made by a mortgage broker whose services they sought in order to obtain a mythical one percent

loan with a rate that would not likely grow more than one-tenth of a percentage point annually.

On one version of the facts, the broker, Western Thrift's agent, assured the Darlings that they

were worthy applicants for such a loan and that he could obtain such a loan for them from a

bank.  The Darlings placed their trust in the broker, agreed to apply for such a loan, did so based

on his assurances that such a loan was in fact available, and relied on him to procure the loan for

them.  Thereafter, when a loan package was presented to them that did not appear to conform to

the broker's representations, the Darlings balked, but upon placing a call to the broker, went

through with the deal based on his representation that it was in fact the one percent loan they had

talked about and that they simply did not understand the loan paperwork.

On this record, the Darlings have all of the evidence necessary to generate a genuine

factual dispute on all the elements of their varied state law tort claims, with the possible

exception of justifiable reliance.  The fraud and negligent misrepresentation claims largely

overlap, though the former requires proof by clear and convincing evidence.  Fraud requires a

showing (1) that the other party made a false representation (2) of a material fact (3) with

---

[8]      See 15 U.S.C. § 1602(f);  see also Regulation Z definition of creditor, 12 C.F.R. § 226.2(a)(17).

knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose

of inducing him to act in reliance upon it, and (5) he justifiably relied upon the representation as

true and acted upon it to his damage.  Guiggey v. Bombardier, 615 A.2d 1169, 1173 (Me. 1992).

Negligent misrepresentation requires a showing that the other party, in the course of his business,

supplied false information for the guidance of the plaintiffs in their business transactions, and

that the plaintiffs justifiably relied upon that information to their pecuniary harm.  Id.

       The record presents a genuine question whether the broker supplied the Darlings with

information he knew to be false concerning the terms of the loan he secured for the Darlings, for

the purpose of inducing their reliance, which resulted in economic harm when the terms were not

as good as represented.  That evidence satisfies the requirements of both misrepresentation torts.

Additionally, in this commercial context it would also be sufficient to demonstrate an "unfair or

deceptive" commercial practice for purposes of Maine's Unfair Trade Practices Act (UTPA), 5

M.R.S. § 207.  "Whether a trade practice is unfair or deceptive is a question of fact determined

by the fact-finder."  State v. Weinschenk, 2005 ME 28, ¶ 15, 868 A.2d 200, 206.  "An act or

practice is deceptive if it is a material representation, omission, act or practice that is likely to

mislead consumers acting reasonably under the circumstances."  Id., ¶ 17, 868 A.2d at 206.  The

provision of false information about the terms of a loan is likely to be regarded by a fact finder as

material and likely to mislead consumers to their financial detriment, assuming that reliance is

justified.  That leaves the fiduciary duty claim and the so-called "malice" claim.

       "The question of whether one party owes a fiduciary or other duty of due care to another

is a question of law."  Fortin v. Roman Catholic Bishop of Portland, 2005 ME 57, ¶ 35, 871 A.2d

1208, 1220.  What is needed to demonstrate the required relationship is evidence that one party

placed its trust and confidence in the other and that there was a great disparity of position and

influence favoring the one in whom the trust was placed.  Camden Nat'l Bank v. Crest Constr., Inc., 2008 ME 113, ¶ 13, ___ A.2d ___, ___.  The Law Court has held that the mere existence of a creditor-debtor relationship or a mortgagor-mortgagee relationship will not establish the existence of a confidential or fiduciary relationship.  Id., 2008 ME 113, ¶ 15;  Stewart v. Machias Sav. Bank, 2000 ME 207, ¶ 11, 762 A.2d 44, 46.  By extension, it seems plain that the relationship of a mortgage broker to a consumer is not inherently a fiduciary or confidential relationship.  What is required is additional evidence related to the actual placement of trust in another that creates a disparity of position or influence.

The Law Court has characterized great disparity of position or influence as the kind of disparity that arises from "diminished emotional or physical capacity or . . . the letting down of all guards and bars";  the mere "allegation of one party's inexperience and trust" is insufficient absent evidence "indicating the actual placing of confidence and trust, and the abuse of the relation."  Stewart, 2000 ME 207, ¶ 11, 762 A.2d at 46.  The mere fact that the Darlings assert their relative inexperience and lack of sophistication is, therefore, not sufficient to support their breach of fiduciary duty claim.  However, they have also presented a record that is capable of supporting a finding that they placed their trust in the broker based on his assurances that they should do so.  This is evidence of the actual placement of confidence and trust in another.  That trust could support a finding that they let down "all guards and bars" precisely because it appears that they placed their trust in the broker despite their own skepticism that the loan presented to them would correspond with the broker's alleged assurances.  This trust could therefore be regarded as giving the broker a great disparity of position or influence over the Darlings' decision.  Someone with years of experience in the business of procuring mortgage loans from lenders who has represented to a consumer that he will secure a loan with certain terms or certain

likely financial consequences is in a special position of knowledge in relation to whether or not the loan actually procured measures up to his assurances.

In <u>Morris v. Resolution Trust Corp.</u>, the Law Court affirmed a plaintiff's verdict in a fiduciary duty action supported by evidence that the plaintiff borrower had placed her trust in and relied on representations made by the defendant bank's loan officer, who reassured her that her contractor (a bank customer with delinquent accounts) was reliable and good and that she should stick with him on a renovation project financed by the bank.  622 A.2d 708, 711-712. The Law Court observed that the claim was not defeated simply because there was no "evidence . . . that [the plaintiff] was completely incapable of acting to protect her own interests."  <u>Id.</u> at 712.  The salient factors in <u>Morris</u> were that the plaintiff expressed her concern and doubt about continuing her relationship with the contractor, but placed her trust in and relied to her detriment on representations made by the loan officer who professed superior knowledge based on his own course of dealings.  <u>Id.</u>  There is a genuine question whether those circumstances exist here.  The Darlings relied on the broker, expressed doubt in continuing when they saw the terms of the loan he delivered, but placed their trust in his reassurances that they simply did not understand loan paperwork as he did, based on his superior knowledge of the same.  This placement of trust, allegedly based on the broker's reassurances and promises, generates the potential factual finding needed to support the imposition of a fiduciary duty as a matter of law.

Underlying all of these claims is the very troublesome question of whether the Darlings justifiably relied on the alleged representations made by the broker.  This concern arises precisely because the Darlings were provided at the closing with proper disclosures and with loan documents that belied the existence of the "one percent loan" that the Darlings maintain they were promised.  Additionally, Western Thrift emphasizes that the Darlings had a few days

in which to review the documents and lawfully rescind the loan, had they exercised sufficient

diligence.  (Mot. for Summ. J. at 11-12.)  As for diligence, the record reflects that Ms. Darling

did understand as of the closing date that the language on the loan documents warned of the

possibility of a significant fluctuation in the applicable interest rate over the life of the loan, and

that the rate would be recalculated sometime between the Darlings' first and second payments.

In addition to highlighting these facts Western Thrift attempts to buttress its argument for

summary judgment by invoking the parol evidence rule, arguing that it is entitled to judgment on

the question as a matter of law.  (Id. at 12-13.)

　　　　Before addressing the evidence as it pertains to reliance, it is plain from Law Court

precedent that the parol evidence rule does not impact the dispute between the Darlings and

Western Thrift.  The parol evidence rule does not apply here because the Darlings are not trying

to prove that the IndyMac mortgage is not binding as written or that there was some preexisting

agreement with IndyMac that modifies the terms of the mortgage they entered into.  See Nelson

v. Leo's Auto Sales, Inc., 158 Me. 368, 370 (Me. 1962) ("The nature of the action allows the

plaintiff to introduce testimony *aliunde*, not for the purpose of altering the written contracts but

rather to evidence the fact, as she says, a false and fraudulent representation [was] made for the

purpose of inducing her to execute them.").

　　　　As for the element of justifiable reliance, it presents an issue of fact.  Devine v. Roche

Biomed. Labs., Inc. , 637 A.2d 441, 446 (Me. 1994).  In this case the Court must weigh the

Darlings' understanding that the language of their actual mortgage loan was inconsistent with the

alleged representations of the broker against the alleged assurances by the broker that the interest

rate would not likely increase from one percent by more than one-tenth of a percentage point

monthly.   In effect, the Court is being called upon to decide whether consumers whose antennae

17

are attuned to the fact that an offer sounds too good to be true should be precluded from suing when their suspicions are confirmed, even if it effectively insulates a mortgage broker from liability for (on one version of the facts) patently false representations about the way the so-called one percent loan (as in a loan having a one-month introductory rate and a monthly payment schedule resulting in negative amortization) will play out over time.  My conclusion is that that decision ought to be made by the jury because a contrary ruling would effectively insulate mortgage brokers from liability for sharp practices.

Finally, there is a claim of "malice."  This is really a plea for punitive damages, which are available, generally speaking, when the evidence supports a finding that tortious conduct was motivated by actual or implied malice.  Morris, 622 A.2d at 712 (citing Tuttle v. Raymond, 494 A.2d 1353, 1361 (Me. 1985)).  In Morris, discussed above, the Law Court affirmed an award of punitive damages based on evidence that the loan officer's advice was misleading and motivated by a desire to realize a financial gain at the plaintiff's expense, holding that "[t]his behavior may reasonably be considered outrageous, and thus supports a finding of implied malice sufficient for an assessment of punitive damages."  Id. at 713.  The same might be found with respect to the present record.[9]

### 3.    The Court has broad discretion whether to exercise supplemental jurisdiction over the remaining claims.

Pursuant to 28 U.S.C. § 1367(a):

[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

---

[9]      Western Thrift also argues that there are no damages in this case and that the Darlings have failed to mitigate damages by attempting to refinance.  (Mot. for Summ. J. at 23-24, citing Pl.'s Statement ¶¶ 60-63.)  The argument that no damages exist relies on a false characterization of the record.  (See Roxanne Darling Dep. at 182:7-182:24.)  Western Thrift is correct that there may well be a significant failure to mitigate damages here but Western Thrift does not adequately explain why that fact would entitle it to judgment as a matter of law.

According to the Supreme Court, section 1367's grant of authority over supplemental claims between parties who are already properly in federal court "should be read broadly, on the assumption that in this context Congress intended to authorize courts to exercise their full Article III power to dispose of an 'entire action before the court [that] comprises but one constitutional case.'" Exxon Mobil Corp. v. Allapattah Servs., Inc., 125 S. Ct. 2611, 2617 (2005) (quoting Finley v. United States, 490 U.S. 545, 549 (1989)).

> Section 1367(a) is a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction. The last sentence of § 1367(a) makes it clear that the grant of supplemental jurisdiction extends to claims involving joinder or intervention of additional parties.

Id. at 2620.

The Court had original jurisdiction over this case at its inception based on the federal question presented by the TILA claims. Supplemental jurisdiction over the state law claims between the Darlings and Western Thrift, therefore, may be exercised notwithstanding the absence of evidence that the amount in controversy would permit original jurisdiction to be exercised based on the parties' diversity of citizenship. An exercise of supplemental jurisdiction is permissible "when the federal and nonfederal claims 'derive from a common nucleus of operative fact.'" Finley, 490 U.S. at 549 (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966)). Here, the claims pursued by the Darlings are related in such a fashion.

The "justification" for exercising supplemental jurisdiction "lies in considerations of judicial economy [and] convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims." Gibbs, 383 U.S. at 726. In the words of the statute:

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
  (1) the claim raises a novel or complex issue of State law,
  (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
  (3) the district court has dismissed all claims over which it has original jurisdiction, or
  (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  The parties have not addressed whether or not the Court should continue to exercise supplemental jurisdiction over the state law claims, presumably because they would both prefer for the matter to be resolved in the context of the present action.

The Court has broad discretion over the decision to exercise supplemental jurisdiction. Chungchi Che v. Mass Bay Transp. Auth., 342 F.3d 31, 37 (1st Cir. 2003).  On this record the Court would presumably be affirmed however it decided the matter.  Because it is most efficient for the court system and for the litigants if the Court brings this dispute to judgment in the context of the present civil action, I recommend that the Court retain supplemental jurisdiction over the action.

## Conclusion

For the reasons articulated in the foregoing discussion, I RECOMMEND that the Court GRANT, IN PART, Western Thrift & Loan's motion for summary judgment (Doc. No. 45), by entering judgment in its favor on the TILA claim (count I), and otherwise deny the motion.

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy

20

thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

August 12, 2008

21