UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JOSEPH and ROXANNE DARLING, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV-06-123-B-W |
| | ) | |
| WESTERN THRIFT & LOAN, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER AFFIRMING RECOMMENDED DECISION ON DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

Homeowners Roxanne and Joseph Darling claim their mortgage broker, Western Thrift & Loan (Western), defrauded them and violated state and federal consumer protection regimes when its agent induced them to refinance their home with an adjustable rate mortgage that is becoming more expensive by the day. Before the Court is Western's motion for summary judgment, which the Magistrate Judge has recommended be granted in part and denied in part. Because the Court agrees with the Magistrate Judge that (1) Western should be granted judgment on the sole federal cause of action, (2) it is appropriate that the Court exercise supplemental jurisdiction over the remaining state law claims, and (3) there exist genuine issues of material fact with respect to each element of all remaining claims, the Court affirms the recommendations of the Magistrate Judge.

**I.      STATEMENT OF FACTS**

With significant expenditures planned, the Darlings refinanced their $190,000 mortgage by borrowing $266,250 in 2005, leaving them roughly $75,000 in cash. They thought they had borrowed on the cheap: one percent for one year, and yearly increases of only one-tenth of one percent, at most, each year thereafter. It turns out the terms of the new loan are dramatically

different.  The interest rate increased far more rapidly than expected, and the principal amount has grown, or negatively amortized, because they have been paying only a portion of the interest due.  Crying foul, the Darlings filed suit against their lender, IndyMac Bank; their individual mortgage broker, Paul Mikhail; and his employer, Western.

After voluntarily moving to dismiss IndyMac and Mr. Mikhail, the Darlings filed a Second Amended Complaint naming Western as the sole defendant.  *Second Am. Compl. for Actual and Punitive Damages, Inj. Relief and for Decl. J. on Rescission under TILA, Violations of Maine's Unfair and Deceptive Practices Act, Negligent Misrepresentation, Breach of Fiduciary Duty and Malice* (Docket # 32) (*Second Am. Compl.*).  Western moved for summary judgment.  *Def. Western Thrift & Loan's Mot. for Summ. J. or, in the Alternative, Mot. for Partial Summ. J./Summ. Adjudication* (Docket # 45) (*Def.'s Summ. J. Mot.*); *Def. Western Thrift & Loan's Supporting Statement of Material Facts in Supp. of its Mot. for Summ. J. or Alternatively Partial Summ. J./Summ. Adjudication* (Docket # 46) (*Western's SMF*).  The Darlings responded and Western replied.  *Pls.' Opp'n to Def. Western Thrift & Loan's Mot. for Summ. J.* (Docket # 51); *Pls.' Counter-Statement of Material Facts in Dispute in Supp. of their Opp'n to Def. Western Thrift & Loan's Mot. for Summ. J.* (Docket # 52) (*Darlings' SMF*); *Def. Western Thrift & Loan's Reply to Pls.' Opp'n to Mot. for Summ. J., or in the Alternative, Mot. for Partial Summ. J./Summ. Adjudication* (Docket # 59); *Def. Western Thrift & Loan's Reply Statement of Material Facts in Supp. of its Reply to Pls.' Opp'n to Mot. for Summ. J., or in the Alternative, Mot. for Partial Summ. J./Summ. Adjudication* (Docket # 60) (*Western's RSMF*).  The Magistrate Judge filed with the Court her recommended decision on Western's motion on August 12, 2008.  *Recommended Decision* (Docket # 61) (*Rec. Dec.*).  Western filed its objections and the Darlings filed their response thereto on August 22 and 26, respectively.

*Objection to Magistrate's Recommended Decision and Request for De Novo Review and Oral Argument* (Docket # 62) (*Def.'s Obj.*); *Pl.'s Opp'n to Def.'s Objection to the Magistrate Judge's Recommended Decision Respecting the Def.'s Mot. for Summ. J.* (Docket #63) (*Pls.' Resp.*).

## II.   THE RECOMMENDED DECISION

Following a comprehensive recitation of the facts, the Magistrate Judge addressed each of the Darlings' six claims, beginning with the only one arising under federal law.

### A.   Summary Judgment on the Truth in Lending Act Claim

Plaintiffs allege that Western violated the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq.*, by failing to disclose information material to the loan transaction.  The Magistrate Judge concluded TILA's one-year statute of limitation bars this claim.  *Rec. Dec.* at 12-13 (citing 15 U.S.C. § 1640(e)).  The Darlings do not object to this conclusion.  S*ee Pls.' Resp* at 2*.*  Because the Court agrees that the claim is time-barred, and the Plaintiffs do not object, the Court grants Western summary judgment on the TILA claim.

### B.   Supplemental Jurisdiction under 28 U.S.C. § 1367

Granting summary judgment on the only claim arising under federal law requires that the Court decide whether to exercise jurisdiction over the remaining state law claims.  The statute conferring supplemental jurisdiction on the district courts states, in part:

> (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).  The First Circuit has observed that "state and federal claims form part of the same constitutional case if they 'derive from a common nucleus of operative fact' or 'are such that . . . would ordinarily be expected to [be] tried . . . in one judicial proceeding.'"

*Penobscot Indian Nation v. Key Bank of Me.*, 112 F.3d 538, 563-64 (1st Cir. 1997) (alterations in original) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).  The Court is satisfied that the state law tort claims and the time-barred TILA claim derive from a common nucleus of operative fact—the IndyMac loan transaction—and that exercise of supplemental jurisdiction is proper, notwithstanding dismissal of the only claim over which the Court had original jurisdiction.  *See* 28 U.S.C. § 1367(c); *Cao v. Puerto Rico*, 525 F.3d 112, 116 (1st Cir. 2008).  Furthermore, the Magistrate recommended that the Court exercise continuing jurisdiction over the Darlings' state law claims, and neither party objected to this recommendation.  The Court will continue to exercise supplemental jurisdiction over the state law claims.

## C.     The State Law Claims and Western's Objections

Western filed six objections in its request for *de novo* review of the recommended decision.  Its first, a general objection that the Magistrate Judge failed to cite adequately the summary judgment record, is directed to the Magistrate Judge's recommendations on all the Darlings' remaining claims.  *Def.'s Obj.* at 3.  The Court does not address the general objection independently.  Instead, the Court considers it throughout this Order, viewing the supported facts in the light most favorable to the Darlings, the non-movants, and giving them the benefit of all reasonable inferences.  *See Cordi-Allen v. Conlon*, 494 F.3d 245, 248 (1st Cir. 2007); *Robinson v. Wright*, 460 F. Supp. 2d 178, 182 (D. Me. 2006).  For the sake of clarity, the Court discusses Western's objections not in the sequence Western presents them, but in the sequence the Magistrate Judge analyzed the Darlings' underlying claims.

### 1.     Objections to Recommended Decision on Fourth Cause of Action for Fraud

In Western's motion for summary judgment, it contended the Darlings' allegations of fraud are insufficiently particular and run afoul of Federal Rule of Civil Procedure 9(b).  *Def.'s*

4

*Summ. J. Mot.* at 18; Fed. R. Civ. P. 9(b).  In its objection to the recommended decision, Western reiterates this contention and notes that the Magistrate Judge failed to address it.

Where, as here, "state law governs the burden of proving fraud at trial, the procedure for pleading fraud in federal courts in all diversity suits is governed by the special pleading requirements of Federal Rule of Civil Procedure 9(b)."  *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985); *Siegemund v. Shapland*, 247 F. Supp. 2d. 1, 7 (D. Me. 2003).  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  In other words, Rule 9(b) requires a fraud plaintiff to specify "the time, place, and content of an alleged false representation."  *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999) (internal quotation omitted).  The First Circuit has articulated Rule 9(b)'s three purposes:  "(1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations.  *New Eng. Data Servs., Inc. v. Becher*, 829 F.2d 286, 289 (1st Cir. 1987).

Western states that the Darlings "do not allege which terms of the loan transaction were allegedly misrepresented, and therefore Western and Mikhail are left to guess which terms were allegedly misrepresented."  *Def.'s Obj.* at 7.  However, the Darlings allege that Mr. Mikhail misrepresented, among other things, the impact of the variable interest rate on their loan and the facts surrounding Western's compensation.  *Second Am. Compl.* ¶¶ 13-15, 47.  This is minimally sufficient for Rule 9(b) purposes.  What is more, Western's arguments belie its position. Western vigorously disputes each specific alleged false representation the Darlings attribute to it and Mr. Mikhail.  Western says that Mr. Mikhail never misrepresented the possible effects of a

variable interest rate. *Def.'s Obj.* at 7-8. Elsewhere, Western disputes the Darlings' allegations regarding its compensation. *Id.* at 4. The Court overrules Western's objection because it is apparent that Western had adequate notice of the Darlings' non-frivolous fraud allegations and has prepared meaningful responses.[1]

Western's next objection on the fraud claim strikes at the heart of the controversy and substantially overlaps its other objections. Western argues that Mr. Mikhail never made a false representation of a material fact to the Darlings; and, even if the record supports a finding that he did, the Darlings either did not rely on it or were not justified in doing so.[2] *Def.'s Obj.* at 7-8.

> To sustain a fraud claim, a party must show: (1) that the other party made a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing him to act in reliance upon it, and (5) he justifiably relied upon the representation as true and acted upon it to his damage.

*Guiggey v. Bombardier*, 615 A.2d 1169, 1173 (Me. 1992). The Magistrate Judge determined that "[t]he record presents a genuine question whether [Mr. Mikhail] supplied the Darlings with information he knew to be false concerning the terms of the loan he secured for the Darlings, for the purpose of inducing their reliance, which resulted in economic harm when the terms were not as good as represented." *Rec. Dec.* at 14. The Magistrate Judge's determination is correct. *See Napier v. F/V Deesie, Inc.*, 454 F.3d 61, 66 (1st Cir. 2006) (explaining that a movant for summary judgment bears the burden to "demonstrate that there is 'an absence of evidence to

---

[1] Western did not raise the Rule 9(b) argument in its answers to either of the Darlings' amended complaints. *See Answer of Def. Western Thrift & Loan to First Am. Compl.* (Docket # 7); *Answer of Def. Western Thrift & Loan to Second Am. Compl.* (Docket # 34).

[2] Western also argues, both in its reply statement of facts and in its objection, that the parol evidence rule bars the introduction of any evidence of Mr. Mikhail's alleged misrepresentations. The Court agrees with the Magistrate Judge that this argument is without merit. *See Rec. Dec.* at 17. As the Law Court has often clarified, "[a] signed agreement that contradicts prior oral statements does not bar an action for fraud as a matter of law. Parol evidence of fraudulent inducement may be introduced to show that a signed document does not reflect the intent of the parties." *Ferrell v. Cox*, 617 A.2d 1003, 1006 (Me. 1992); *Harriman v. Maddocks*, 518 A.2d 1027, 1029 (Me. 1986) ("Any person may introduce parol evidence 'to evidence the fact [of] a false and fraudulent representation made for the purpose of inducing [that person] to execute [a contract].'" (alterations original) (quoting *Nelson v. Leo's Auto Sales, Inc.*, 158 Me. 368, 370, 185 A.2d 121, 122 (1962))).

support the nonmoving party's case'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986))).

The Court treats separately Western's supporting record citations that address (1) whether Mr. Mikhail made representations of material fact, and the content of those representations; and (2) whether the Darlings justifiably relied on them to their detriment.  Western states that the Darlings "admitted that Mikhail *never* represented to [them] that the interest rate of their loan would not change in the first year of the loan, only that the amount of [their] *payment* would not change during the first year."  *Def.'s Obj.* at 8 (citing *Western's SMF* ¶ 50; *Darlings' SMF* ¶ 50 (Admit)).  Although the Court strains to interpret as the parties do Mrs. Darling's deposition testimony on this point, the Court will not disturb the Darlings' admission.[3]  The Court need not.  Citing other excerpts of Mrs. Darling's deposition, the Darlings state that during a call they made to Mr. Mikhail during the loan closing, "Mr. Mikhail confirmed that the paperwork detailed a one percent loan[4] as he had described it throughout the prior months."  *Darlings' SMF* ¶ 99

---

[3]
> Q: Mr. Mikhail told you the amount of your payment would not change for the first year, correct?
> A: Right.
> Q: He did not tell you that the interest rate would not change in the first year, only that the amount would not change in the first year, correct?
> A: No.

*R. Darling Dep.* 195:3-195:9.  It is difficult to know what to make of this inartful question and ambiguous answer.  The question contains three negatives, ends with a positive, and is answered by a negative.  The answer could be—no, you are correct; he did not tell me—or no, you are not correct; he did tell me.  But, since the Darlings have admitted Western's fiftieth statement of material fact, there is no need to go any further.

[4] In its reply statement of material facts, Western lodges multiple objections on vagueness grounds to the phrase "one percent loan," a phrase the Darlings use to refer to the loan they believed they were acquiring.  As is evident from the excerpt from the deposition of Mr. Mikhail cited *infra* note 5, the phrase "one percent loan" itself is not unfamiliar to the parties in this case.  However, they have significantly different conceptions of the terms of that "one percent loan."  For the purposes of this Order unless the context indicates otherwise, the terms of a "one percent loan" are those that the Darlings understood Mr. Mikhail was offering, which were, at a minimum, a fixed interest rate of one percent for the first year, and a variable rate thereafter that would never increase by more than one tenth of a percent per year.  The germ of the Darlings' understanding of these terms is the March 3, 2005 Truth in Lending Act Disclosure Notice.  *Darlings' SMF* ¶ 79; *March 3, 2005 Truth in Lending Act Disclosure Notice* (Docket # 56-5).

(citing *R. Darling Dep.* 140:6-140:13; 140:21-142:3; 192:3-193:22).  The record citations are in

full support:

> Q:  Did you discuss with Mr. Mikhail the specific
> language in the Adjustable Rate Rider about the
> interest rate change dates?
> A:  I did.
> Q:  And he told you you could just disregard that?
> A:  He didn't say disregard, no.  He said:  You need to
> remember what I have told you.  This one percent is
> going to be good for one year.

*R. Darling Dep.* 141:11-141:18.

> Q:  And just again, how was Mr. Mikhail able to satisfy
> yourself to proceed notwithstanding the apparent
> inconsistencies?
> A:  Just telling me that I don't understand how the loan
> process works.  He said:  You don't understand all
> these documents.  I do.  I've explained everything,
> how it all goes.  You need to trust me.  You need to
> just do what I said and trust me.  When your first
> bill comes in, you're going to see everything has
> worked out fine.
> Q:  Did Mr. Mikhail confirm for you that you had a loan
> that would be one percent for one year?
> A:  Yes.  Yes.
> Q:  Did Mr. Mikhail confirm for you that although after
> the first year the rate could change, and his
> experience was it has not gone up more than a 10th
> of a percent a year?
> A:  Yes.

*Id.* at 193:5-193:22.  Even if the Darlings' statements might not be wholly consistent, there exists

a genuine issue of material fact with respect to whether Mr. Mikhail told the Darlings that their

loan would remain at one percent for the first year and whether he knew this was not true.[5]

Further, it is reasonable to infer that Mr. Mikhail made these representations to the Darlings for

---

[5] "Mikhail discussed with Plaintiffs an option ARM with a start rate of one percent, in which Plaintiffs had expressed an interest.  Moreover, the option ARM loan described to Plaintiffs would stay at one percent for one month."  *Western's SMF* ¶ 47 (citing *P. Mikhail Dep.* 65:9-65:11 ("Q:  Okay.  How long was the 1 [one] percent loan that you described to the Darlings going to stay at 1 [one] percent?  A:  It's just the first month.")).

the purpose of inducing their reliance.  *See Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007) (instructing that reasonable inferences must be drawn in the light most favorable to the non-movant).

Although Western does not press its objection on the issue of justifiable reliance in the context of the fraud claim, it is sensible to consolidate the reliance arguments and discuss them here.  The Magistrate Judge candidly described the justifiable reliance question as "very troublesome."  *Rec. Dec.* at 16.  Reasoning that justifiable reliance presents an issue of fact, and that the parties presented facts suggesting the Darlings executed loan documents (which a jury could find were clear and not false) based on their understandings from Mr. Mikhail's alleged representations (which a jury could find were opaque and false), the Magistrate Judge recommended the Court allow a jury to resolve the question.  *Id.* at 17-18 (citing *Devine v. Roche Biomedical Labs., Inc.*, 637 A.2d 441, 446 (Me. 1994)).  Western's principal argument is that the Magistrate's recommendation cannot stand in the light cast by the Darlings' admissions that the actual terms of the loan were disclosed by the loan documents, which the Darlings read and understood at the time they executed them.  *Def.'s Obj.* at 3-4.  The Court interprets this argument to mean both that the Darlings did not rely on Mr. Mikhail's representations, and, if they did, they were not justified in doing so because they knew his representations were false.

The record does not readily permit these conclusions.  Mrs. Darling understood that she and her husband were obtaining an adjustable rate loan, and that the interest rate would not stay at one percent for the life of the loan.  *Western's SMF* ¶ 24; *Darlings' SMF* ¶ 24 (Admit).  Mrs. Darling also understood that when she signed the Adjustable Rate Rider on May 1, 2005, it indicated that the interest rate could change as early as July 1, 2005.  *Western's SMF* ¶ 25; *Darlings' SMF* ¶ 25 (Admit); *see also Western's SMF* ¶ 34 (citing Adjustable Rate Rider, which

provides for a maximum interest rate of 9.95%).  However, even though Mrs. Darling testified that she understood at the deposition that the rate would adjust, and she understood what those adjustable rate provisions meant at the closing on May 12, 2005, it was not necessarily her understanding because it was not what she had been told.  *Darlings' SMF* ¶ 26.  As indicated above, Mrs. Darling said that Mr. Mikhail told her the interest rate would not increase during the first year and that increases thereafter would not exceed one-tenth of a percent per year.  *See Darlings' SMF* ¶¶ 26, 99 (citing *R. Darling Dep.* 192:3-193:22).  The record thus supports a finding that the Darlings may have had divergent understandings of the loan at the closing—one from Mr. Mikhail's alleged representations and one from the documents.  The great extent to which these understandings diverged is apparent from the fact that the Darlings called Mr. Mikhail during the closing to ask him questions.  *Darlings' SMF* ¶ 98; *Western's RSMF* ¶ 98 (Qualified).  Finally, it is reasonable to infer that the Darlings relied on Mr. Mikhail's alleged representation that the loan documents—which the Darlings "did not understand," according to Mr. Mikhail, *Darlings' SMF* ¶ 99—were faithful to the original deal.

To fend off summary judgment, the Darlings must demonstrate there is a genuine issue as to whether their reliance, detailed above, was justified.  Under Maine law, a party "'may justifiably rely on the fraudulent misrepresentation of [another] . . . without investigating the truth or falsity of the representation.  Reliance is unjustified only if the plaintiff knows the representation is false or its falsity is obvious to him.'"  *St. Francis De Sales Fed. Credit Union v. Sun Ins. Co. of N.Y.*, 2002 ME 127, ¶ 29, 818 A.2d 995, 1003 (alterations in original) (quoting *Estate of Whitlock*, 615 A.2d 1173, 1176 (Me. 1992)).  Western argues against justifiable reliance from the proposition that the Darlings "cannot be defrauded as to contract terms they understood."  *Def.'s Obj.* at 8.  Mindful that there is a genuine issue as to the actual nature and

extent of the Darlings' understanding, the Court takes Western's argument to be that when there exists a writing that clearly contradicts prior oral representations, a person can never be justified in relying on the oral rather than the written terms.

In *Ferrell v. Cox*, 617 A.2d 1003 (Me. 1992), the Law Court addressed a very similar argument. Cox, then an active judge, contacted Ferrell, a lawyer and adjacent landowner, to inquire whether Ferrell would convey a utility easement to him so that he could run power and telephone lines across Ferrell's property to his cottage. *Ferrell*, 617 A.2d at 1004-05. Ferrell agreed to the conveyance in reliance on Cox's professed opposition to developing the peninsula on which they both lived, a sentiment Ferrell shared. *Id.* at 1005. Upon reading the deed that Cox drafted, Ferrell became concerned that the language described an unrestricted easement, and not one limited to utility lines for Cox's cottage. *Id.* Cox assured Ferrell that the power company required the broad language and that it was standard practice. *Id.* In fact, Cox had been acquiring various property rights from landowners on the peninsula with the intention of transferring them to a developer, which he accomplished following the Ferrell conveyance. *Id.* After losing a motion for a directed verdict and being found liable on Ferrell's fraudulent misrepresentation claim, Cox argued on appeal that the signed writing precludes a finding of justifiable reliance. *Id.* at 1006. The Law Court not only stated the inapplicability of the parol evidence rule, *see supra* note 2, but also concluded

> the record establishes that Ferrell agreed to sign the deeds conveying an easement to Cox only after Cox told him the broader language had been included on the request of the utility company and reaffirmed his previously stated intention to use the easement only to reach his own property. Based on this evidence the jury rationally could have found that Ferrell did not know Cox's representations were false or that the falsity of Cox's representations was not obvious to him.

*Id.* at 1006-07. Here, allegedly Mr. Mikhail told the Darlings—who are neither mortgage brokers like he is, nor lawyers like Farrell and Cox are—that they "did not understand loan

paperwork" and that they were signing up for the one percent loan they had talked about for months. *Darlings' SMF* ¶ 99. Moreover, at that time the Darlings thought Mr. Mikhail worked for IndyMac. *Darlings'* SMF ¶ 103; *Western's RSMF* ¶ 103 (Qualified).[6] Proceeding under this confusion, and learning for the first time at closing that IndyMac was the lender, *Darlings' SMF* ¶ 101; *Western's RSMF* ¶ 101 (Qualified), the Darlings may have believed that Mr. Mikhail knew better than they the terms of the loan, and the interest rate adjustments IndyMac would apply in the future. Applying the obviousness standard to the record, viewed in the light most favorable to the Darlings, the Court determines that there is a genuine issue of material fact with respect to justifiable reliance. *See Robinson v. Wright*, 460 F. Supp. 2d 178, 183-84 (D. Me. 2006).

The final element of fraud is pecuniary damages.[7] *Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me. 1987). The Magistrate Judge determined that the record presents a genuine issue whether the Darlings suffered economic harm when they accepted loan terms that were not as favorable as those Mr. Mikhail allegedly represented. *Rec. Dec.* at 14; *see Aff. of Roxanne Darling in Supp. of Pls.' Opp'n to Def. Western Thrift & Loan's Mot. for Summ. J.* ¶ 23 (Docket # 55). Western objects to this damages determination only by citing the Darlings admission that "they could not have done a regular refinance in 2005 for the amount of money they borrowed from IndyMac Bank." *Def.'s Obj.* at 8 (citing *Western's SMF* ¶ 8; *Darlings' SMF* ¶ 8 (Admit)).

---

[6] Western objects to this statement of fact on the grounds that it is irrelevant and lacks foundation pursuant to Federal Rules of Evidence 401 and 402. *Western's RSMF* ¶ 103 (Qualified). The Court overrules the objection. The fact is relevant because if true, it tends to make it more probable that the Darlings' reliance on Mr. Mikhail's representations was justified.

[7] Maine law "draws a clear distinction between fraud that will vitiate a contract and fraud that is actionable as deceit." *Kuperman v. Eiras*, 586 A.2d 1260, 1262 (Me. 1991) (internal quotation omitted). "It is not necessary that actual damage shall have resulted from fraud in order to justify rescission." *Id.* (internal quotation omitted). Because the record is unsettled with respect to whether the Darlings seek rescission and whether it is available, the Court does not decide at this stage of the case whether the Darlings may eventually be relieved of proving pecuniary damages. *Compare Second Am. Compl.* at 11-12 (praying for an order that Western assume the Darlings' obligations to IndyMac, and for actual, statutory, restitutionary, and punitive damages), *with Western's SMF* ¶ 14 ("Plaintiffs wish to rescind the entire loan transaction, to keep their property and $75,000 free and clear, with no obligation whatsoever."), *and Darlings' SMF* ¶ 14 (Admit).

The Court interprets Western's syllogism to be as follows: (1) homeowners suffer no damages when they knowingly reduce to cash some portion of their home equity; (2) the only way the Darlings could have reduced to cash some portion of their home equity was by refinancing their existing loan on the actual terms of the IndyMac loan; therefore (3) the Darlings were not harmed when they extracted $75,000 in cash from their home by refinancing their existing loan with IndyMac.  Western's objections to the Magistrate Judge's recommendation as to the fraud claim are overruled.

### 2.    Objections to Recommended Decision on Fifth Cause of Action for Negligent Misrepresentation

As the Magistrate Judge recognized and Western concedes, "[t]he fraud and negligent misrepresentation claims largely overlap."  *Rec. Dec.* at 13; *Def.'s Obj.* at 9.

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 13, 832 A.2d 771, 774 (quotation omitted). Like the Magistrate Judge, the Court has already found that there exist genuine issues of material fact that require denial of summary judgment on the fraud claim.  Western's objections to the recommended decision on the negligent misrepresentation claim are overruled.[8]

---

[8] Western devotes a portion of its objection to a discussion of circumstances under which liability may attach for failure to disclose material facts.  The Court acknowledges that there are Maine cases that explain these circumstances, and considers them in the context of the fiduciary duty claim.  However, because the Darlings have not alleged a failure to disclose in their negligent misrepresentation claim, cases that discuss active concealment and affirmative duty to disclose are not germane.  *See Def.'s Obj.* at 9-10.

### 3.    Objections to Recommended Decision on Second Cause of Action for Violation of Maine's Unfair Trade Practices Act

In their second cause of action, the Darlings allege that Western violated Maine's Unfair Trade Practices Act (UTPA), 5 M.R.S.A. § 207. *Second Am. Compl.* ¶ 38. Specifically, the Darlings claim that Western and Mr. Mikhail violated UTPA in two principal ways: First, they received a Yield Spread Premium Fee (YSP) of $6,989.00 after telling the Darlings that the loan transaction did not involve any broker's fees, and failing to tell the Darlings how that fee affected the loan. Second, they willfully misled the Darlings about the terms of the loan, including the rate at which interest would accrue on the loan. *Id.* In its motion for summary judgment, Western disputed each claim.

### a.    General Principles of UTPA Liability

The UTPA broadly proscribes "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 5 M.R.S.A. § 207. The Law Court has instructed that "[t]o justify a finding of unfairness, the act or practice: (1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition." *State v. Weinschenk*, 2005 ME 28, ¶ 16, 868 A.2d 200, 206. Further, liability may attach under UTPA for deceptive acts:

> An act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances. A material representation, omission, act or practice involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product. An act or practice may be deceptive, within the meaning of Maine's UTPA, regardless of a defendant's good faith or lack of intent to deceive.

*Id.* ¶ 17, 868 A.2d at 206 (internal citations and quotations omitted). Importantly, "[t]he definitions of 'unfair' and 'deceptive' are questions of fact, and whether a particular act or

14

practice is 'unfair' or 'deceptive' is determined on a case-by-case basis." *MacCormack v. Brower*, 2008 ME 86, ¶ 5, 948 A.2d 1259, 1261 (citations omitted).

### b.    UTPA Violation by Misrepresenting the Terms of the Loan

In the Magistrate Judge's view, a determination that genuine issues of fact exist with respect to the Darlings' fraud and negligent misrepresentation claims is a sufficient basis on which to deny summary judgment on the UTPA claim. *Rec. Dec.* at 14.  The recommended decision states that "[t]he provision of false information about the terms of a loan is likely to be regarded by a fact finder as material and likely to mislead consumers to their financial detriment." *Id.*  The Court agrees, and by reference incorporates here its analysis of the Darling's fraudulent and negligent misrepresentation claims.  Although denial of summary judgment on the UTPA claim is appropriate on this basis alone, the parties have briefed the issue of the YSP disclosure, and the Court addresses that issue next.

### c.    UTPA Violation by Failing to Disclose Broker Compensation

In response to the Darlings' allegations that Western received the YSP after saying it would not, Western states that Mr. Mikhail did not receive a YSP *directly* from the Darlings; and, in the event he or Western did receive such a fee, IndyMac disclosed this fact to the Darlings.[9] *Def.'s Summ. J. Mot.* at 10-11 (citing *Western's SMF* ¶¶ 18-21).  The Darlings admit that they did not directly pay Mr. Mikhail any money with respect to the loan transaction, and that "[b]y its nature, broker compensation is not paid by the borrower." *Darlings' SMF* ¶¶ 18-19.  However, the Darlings claim that they did not understand the way in which Western and Mr. Mikhail would be compensated. *Id.* ¶ 20 (citing *R. Darling Dep.* 69:17-70:1).  At her deposition,

---

[9] Western also argues that it and Mr. Mikhail "were not required to make disclosures to Plaintiffs, as Western and Mikhail are not creditors under TILA." *Def.'s Summ. J. Mot.* at 10.  Western has not offered, and the Court is not aware of, any authority for the proposition that so long as it is not subject to TILA's disclosure obligations, Western is free to engage in business practices in the District of Maine through its agents that may be unfair or deceptive under state law.

Mrs. Darling stated that Mr. Mikhail told her "that there would be no fee whatsoever shown on our documents of him receiving any money," and that "there would be no fees, processing fees, brokers fees" on the documents. *R. Darling Dep.* 69:17-69:18, 69:25-70:1. Mrs. Darling also testified that Mr. Mikhail told her he was paid through Pinnacle Quest, a third-party.[10]

In any event, Western did receive the YSP from IndyMac in connection with the Darlings' loan. *Western's SMF* ¶ 62; *Darlings' SMF* ¶ 62 (Admit). The issue is whether the Darlings were aware that Western would receive the YSP from IndyMac, where IndyMac would get the money to pay Western, and, if the Darlings were not aware of these facts, whether their unawareness is material under the UTPA. Western cites the deposition of Molly Graham, IndyMac's Rule 30(b)(6) designee, who, upon reviewing the Darlings' file in Pasadena, California, testified that the Darling file contained a document entitled "Lender's Closing Instructions," which disclosed the YSP. *Western's SMF* ¶ 20. Western also cites the "Lender's Closing Instructions" document, which was marked at the deposition of Roxanne Darling. *Id.* However, Molly Graham was not at the closing,[11] the "Lender's Closing Instructions" does not disclose the source of the YSP funds, and Roxanne Darling's confusion with regard to the YSP is evident from her deposition. Finally, in its statement of facts, Western states that "[b]rokers' fees were disclosed to Plaintiffs; Joseph Darling recalled that the loan paperwork did disclose some type of broker compensation." *Western's SMF* ¶ 21 (citing *J. Darling Dep.* 8:14-8:17); *Darlings' SMF* ¶ 21 (Qualify). It is true that Joseph Darling testified that he had seen certain loan paperwork that mentioned some type of broker compensation. It is apparent from the

---

[10] "Although neither party exactly spells this out in their statements of material facts, Pinnacle Quest appears to have been an entity that held seminars at exotic locations promising educational materials about the latest 'good investment opportunities' and other current topics." *Rec. Dec.* at 2 n.3. One of the Darlings' main goals in refinancing their mortgage was to raise enough cash to join this organization. *Western's SMF* ¶ 2; *Darlings' SMF* ¶ 2 (Admit).

[11] "No one was present at the closing other than Plaintiffs and a representative of Yankee Title." *Darlings' SMF* ¶ 94; *Western's RSMF* ¶ 94 (Admit).

context of his testimony, however, that he was talking about a fixed-rate loan he had undertaken with his ex-wife Lori to purchase a house in a different town.  *See J. Darling Dep.* 5:19-8:17. On this record, the Court does not hesitate in finding there is a genuine factual issue regarding whether the Darlings knew Western would receive a YSP from IndyMac.

Even if the YSP was disclosed to the Darlings at or before the closing, there still exists a genuine issue whether the disclosure was full and accurate.  Notwithstanding the Darlings' admissions that they did not directly pay Mr. Mikhail any money and that by its nature broker compensation is not paid by the borrower, the record indicates that Mr. Mikhail did not tell the Darlings where IndyMac got the money it ultimately paid to Western.  On this point, Western cites the following exchange from Mr. Mikhail's deposition testimony:

> Q:  Did you ever tell the Darlings that you were not
> going to receive any money from them for your work on
> the – in obtaining this loan?
> A:  That I would receive no money from them?
> Q:  Correct.
> A:  Well, I don't receive any money from them.  And
> I wouldn't have received any money from them.

*P. Mikhail Dep.* 116:7-116:13 (cited in *Western's SMF* ¶ 18).  Western fails to cite the exchange immediately following:

> Q:  Well, the amount that you are paid is paid by
> the bank and its included in the amount financed;
> correct?
> A:  Correct.  There's a – you know, for every loan
> we do there is a percentage that is paid based on the
> rate or based on the loan or whatever the lender is
> paying out on that.
> Q:  You don't get a check directly from the
> borrower –
> A:  No.
> Q:  – but you get paid indirectly from the
> borrower?  It's through the loan?
> A:  Yeah, I get paid through the loan from the
> broker.

Q:  Do you ever explain that mechanism to the
Darlings?
A:  That mechanism of paying through the broker?
No, I had never explained that to them.

*P. Mikhail Dep.* 116:14-117:6; *but see Mortgage Loan Origination Agreement* (Docket # 50-2)

("The retail price we offer you—your interest rate, total points and fees—will include our

compensation.").  Assuming the YSP was disclosed to the Darlings, Mr. Mikhail's testimony,

when combined with the Mortgage Loan Origination Agreement, is evidence that the economic

substance of the YSP may not have been explained to and understood by the Darlings.

The Court is satisfied that a genuine issue of fact exists with regard to whether the

Darlings were misinformed about the existence or nature of the YSP.  Further, the Court is

satisfied that this misinformation, if true, is material in both required respects:  First, it is

material under the substantive law—it involves information that is likely to affect consumer

choice.  *Weinschenk*, 2005 ME 28, ¶ 17, 868 A.2d at 206.  Second, it is material under the

procedural law—"it has the potential of determining the outcome of the litigation."  *Maymi v.

P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008).  An act or practice is deceptive under UTPA if

it is a "material representation, omission, act or practice that is likely to mislead consumers

acting reasonably under the circumstances."  *Weinschenk*, 2005 ME 28, ¶ 17, 868 A.2d at 206.

Mr. Mikhail allegedly represented to the Darlings that they would not be paying him for his

services, a representation which, because it depends on the illusory difference between direct and

indirect broker compensation, will likely mislead a consumer acting reasonably under the

circumstances.  Accordingly, the record presents a genuine factual question of whether Mr.

Mikhail's practice with respect to the YSP was deceptive.

**4.      Objections to Recommended Decision on Third Cause of Action for Breach of Fiduciary Duty**

The Darlings claim that Western and Mr. Mikhail were their fiduciaries, and breached their corresponding duties by accepting the YSP after failing to disclose it, failing to ensure that the Darlings received clear and conspicuous notice of the terms of their loan, and inducing the Darlings into "a transaction that was contrary to their interests and needs." *Second Am. Compl.* ¶¶ 41-42.  Western made several arguments in support of its motion for summary judgment on this claim.  Western argued that the fact that the Darlings were free to leave the loan closing without signing any documents, *Western's SMF ¶ 45; Darlings' SMF ¶45 (Admit)*, belies the Darlings' claim that there existed "a great disparity of position and influence" between the parties, which is required under Maine law.  *Def.'s Summ. J. Mot.* at 16-17 (citing *Diversified Foods, Inc. v. First Nat'l Bank*, 605 A.2d 609, 614 (Me. 1992)).  Western also contended that Joseph Darling's self-proclaimed familiarity with adjustable rate mortgages, refinancing transactions, interest rates, and the stock market precludes a finding that Western and Mr. Mikhail were the Darlings' fiduciaries.  *Id.* at 17 (citing *Western's SMF ¶¶ 67-69); but see Darlings' SMF ¶¶ 67-68 (Qualify)*.  Finally, borrowing from the vocabulary of negligence law, Western claimed that the fiduciary duty claim must fail because there is no evidence of causation between the alleged breach and any damages the Darlings may have suffered:  "Plaintiffs understood the loan terms and the Yield Spread Premium was disclosed in the loan terms documents.  Without reliance, there can be no causation." *Id.*

The Magistrate Judge determined that the record generates a genuine issue as to whether there existed a fiduciary relationship between the Darlings and Mr. Mikhail:

> The Darlings relied on the broker, expressed doubt in continuing when they saw the terms of the loan he delivered, but placed their trust in his reassurances that they simply did not understand loan paperwork as he did, based on his superior

19

> knowledge of the same.  This placement of trust, allegedly based on the broker's reassurances and promises, generates the potential factual finding needed to support the imposition of a fiduciary duty as a matter of law.

*Rec. Dec.* at 16.  Western objects to this determination on several grounds, none of which is sufficiently compelling to merit rejection of the Magistrate Judge's recommendation.  Western first points to its supplemental statement of fact, which the Darlings failed to controvert.  *See Def. Western Thrift & Loan's Supplemental Supporting Statement of Material Facts in Supp. of its Mot. for Summ. J. or Alternatively Partial Summ. J./Summ. Adjudication* ¶ 73 (Docket # 49) (*Western's Suppl. SMF*).  Citing the Mortgage Loan Origination Agreement, which purports to define the nature of the Darlings' and Western's relationship, Western states that it and Mr. Mikhail "were not subject to Plaintiffs' control and were not Plaintiffs' agents at any time during the loan transaction."  *Western's Suppl. SMF* ¶ 73; *see Mortgage Loan Origination Agreement* (Docket # 50-2).  Western reasons that because properly stated facts are admitted if uncontroverted, *see* D. Me. Loc. R. 56(f), and the Darlings failed to controvert this supplemental statement of fact, the Darlings admit that there existed no agency relationship and their fiduciary duty claim therefore does not survive summary judgment.

The Court disagrees for several reasons.  First, the Court need not credit "bald assertions" or "empty conclusions" at summary judgment.  *Philip Morris*, 486 F.3d at 8.  Whether Western and Mr. Mikhail were the Darlings' agents, and whether there existed between them a confidential or fiduciary relationship are questions of fact.  *Clapperton v. U.S. Fidelity & Guar. Co.*, 148 Me. 257, 266, 92 A.2d 336, 341 (1952); *Ruebsamen v. Maddocks*, 340 A.2d 31, 35 (Me. 1975); *cf. Fortin v. Roman Catholic Bishop of Portland*, 2005 ME 57, ¶ 35, 871 A.2d 1208, 1220 ("The question of whether one party owes a fiduciary or other duty of due care to another is a question of law.").  Accordingly, even if the Darlings are held to this admission, the existence of

other well-stated facts supports a finding of either an agency or fiduciary relationship that prevents summary judgment.

More importantly, the nonexistence of an agency relationship does not necessarily preclude a finding of a fiduciary relationship. To determine the extent of a principal's vicarious liability, the Law Court has held that a principal, though liable for the acts of an agent, is not liable for the acts of an independent contractor. *Bonk v. McPherson*, 605 A.2d 74, 78 (Me. 1992). The Law Court defined agency as "'the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other to so act.'" *Id.* (quoting *Restatement (Second) of Agency* § 1 (1958)). However, as Western recognizes, the Law Court defines a confidential or fiduciary relationship quite differently: "'[t]he salient elements of a confidential relation are the actual placing of trust and confidence in fact by one party in another and a great disparity of position and influence between the parties to the relation.'" *Camden Nat'l Bank v. Crest Constr., Inc.*, 2008 ME 113, ¶ 13, 952 A.2d 213, 217 (quoting *Ruebsamen*, 340 A.2d at 35). If a third party, harmed by a negligent act of Mr. Mikhail while he was securing a loan for the Darlings, were suing the Darlings on a theory of vicarious liability for the acts of their agent, the Mortgage Loan Origination Agreement and the issue of control and consent could be determinative. Instead, the Darlings are suing Western in tort for the acts of *its* agent, and proceed here under the theory that the existence of a fiduciary relationship may ease their burden of proving fraud. The parties' understandings recited in the Mortgage Loan Origination Agreement are inapposite.

The Darlings' fiduciary duty claim is essentially an alternative theory of liability for Mr. Mikhail's failure to disclose material terms of the IndyMac loan. "When a plaintiff alleges a failure to disclose rising to the level of a misrepresentation, the plaintiff must prove either (1)

21

active concealment of the truth, or (2) a specific relationship imposing on the defendant an affirmative duty to disclose.  *Fitzgerald v. Gamester*, 658 A.2d 1065, 1069 (Me. 1995).  A plaintiff who succeeds in establishing an affirmative duty to disclose pursuant to a fiduciary relationship, however, still must prove a case similar to fraud:

> Substituting nondisclosure for false representation, a party with a fiduciary duty to another commits fraud when he (1) intentionally does not disclose; (2) a material fact to the other; (3) for the purpose of inducing the other to act or refrain from acting in reliance on the failure to disclose; and (4) the other justifiably relies on the nondisclosure and acts upon it to his or her damage.

*Glynn v. Atl. Seaboard Corp.*, 1999 ME 53, ¶ 12, 728 A.2d 117, 120.  Having analyzed the Darlings' allegations of Mr. Mikhail's nondisclosure and the other elements of fraud above, the Court need only address Western's complaint that the record does not support a finding of a fiduciary relationship.

Contrary to Western's assertions, the record allows for the inference that the Darlings actually placed trust and confidence in Mr. Mikhail, and that there was a great disparity of influence between them.  On March 3, 2005, Mr. Mikhail conveyed to the Darlings a Truth in Lending Act Disclosure Notice (March 3, 2005 TILA) describing the one percent loan that he represented he was obtaining for them.  *Darlings' SMF* ¶ 79; *March 3, 2005 Truth in Lending Act Disclosure Notice* (Docket # 56-5); *see supra* note 4.  Mr. Mikhail told them, and they understood, that they could "rely" on the March 3, 2005 TILA, as the final loan would look "pretty much" like the one disclosed therein.  *Darlings' SMF* ¶ 83.  When the Darlings questioned the one percent loan as "too good to be true," Mr. Mikhail would "start from the beginning" and re-state all of his explanations and assurances that the loan would operate essentially as detailed in the March 3, 2005 TILA.  *Id.* ¶ 87.  When the Darlings hesitated to sign the Mortgage Loan Origination Agreement, which disclosed some form of broker compensation,

Mr. Mikhail told them that the Agreement was "just a total legal document" and "just legal stuff," and they should simply sign it.  *Id.* ¶ 91.  Mrs. Darling recalled Mr. Mikhail's reactions to her concerns about the Mortgage Loan Origination Agreement as follows:

> Q:  So tell me why it is that you signed this if this is
> an agreement between you and Western Thrift that is
> different from the agreement you thought you had
> with Mr. Mikhail?
> A:  Because every time I talked to Paul [Mikhail] about
> discrepancies in any of the documents, he constantly
> told me that this is all the procedure:  Don't worry
> about it.  You know what I've told you.  You need to
> trust me.  He goes:  This is just a total legal
> document, he kept telling me.  This is just legal
> stuff.  Just go ahead and sign.  Don't worry.
> You're not paying any broker fees.

*R. Darling Dep.* 134:22-135:8; *Darlings' SMF* ¶ 91.   After she reviewed the actual loan documents and became concerned that Mr. Mikhail had not secured the one percent loan described in the March 3, 2005 TILA, Mrs. Darling called Mr. Mikhail for an explanation. *Darlings' SMF* ¶ 98.  Mr. Mikhail confirmed that the paperwork detailed a one percent loan as he had described it throughout the prior months and as reflected in the March 3, 2005 TILA, and told the Darlings that they "did not understand loan paperwork"; this explanation satisfied the Darlings.  *Id.* ¶ 99.  Finally, speaking from years of experience in the industry, Mr. Mikhail repeatedly assured the Darlings that he had never seen the interest rate on a loan like theirs go up more than one-tenth of a percentage point per year.  *Darlings' SMF* ¶¶ 26-27; *R. Darling Dep.* 36:1-38:24.  Relying on this information, the Darlings signed the Adjustable Rate Rider, which provides for a maximum interest rate of 9.95%.  *Darlings' SMF* ¶¶ 26-27; *R. Darling Dep.* at 36:1-38:24.

The Court agrees with the Magistrate Judge that it is reasonable to infer that the Darlings placed trust and confidence in Mr. Mikhail, and that this trust was in part a function of Mr.

23

Mikhail's professed superior knowledge of mortgage transaction documents. *See Camden Nat'l Bank*, 2008 ME 113, ¶ 13, 952 A.2d at 217. Further, the facts Western offers to rebut the Magistrate Judge's recommendation cut against Western on this issue. Western maintains that the Darlings were under no obligation to sign the loan documents, and that they were free to rescind the loan for three days following the closing. Reasoning that the Darlings were free of its influence in both respects, Western states that it did not have any influence over the Darlings' actions, nor did there exist any great disparity of position between them. However, the reasonable inference is exactly the opposite: the reasonable inference is that had the Darlings kept their own counsel, they never would have signed the documents, and would have rescinded the loan during the three-day rescission period. *See Western's SMF* ¶ 11; *Darlings' SMF* ¶ 11 (Admit) ("In the four days following the loan closing, Plaintiff Roxanne Darling reviewed every page of the paperwork Plaintiffs brought back from the loan closing."). The only reasonable explanation for the Darling's execution of the documents and their failure to rescind the loan, therefore, is that Mr. Mikhail exerted overriding influence over their understanding of the loan terms and their decision-making. Because these facts generate a genuine issue as to whether a fiduciary relationship existed between the Darlings and Mr. Mikhail, and because genuine issues exist with respect to the remainder of the elements of the fraudulent nondisclosure claim, Western's objections to the recommended decision are overruled.

     **5.**    **Objections to Recommended Decision on Sixth Cause of Action for Malice**

The Magistrate Judge properly construed the Darlings' malice claim as a plea for punitive damages. *Rec. Dec.* at 18. As such, it is not an independent basis for liability. *See Rand v. Bath Iron Works Corp.*, 2003 ME 122, ¶ 15, 832 A.2d 771, 775 ("[P]unitive damages may only be awarded in situations when the fact-finder has also awarded compensatory damages."). The

Court agrees with the Magistrate Judge's determination that Mr. Mikhail's conduct—as alleged—might reasonably support a finding of malice, actual or implied, on which an assessment of punitive damages may be based.  *See Morris v. Resolution Trust Corp.*, 622 A.2d 708, 712 (Me. 1993).  Were a jury to believe the Darlings, it might conclude that Mr. Mikhail's advice to them was disingenuous and motivated by a desire to improve his own position at their expense.  Further, it might conclude that, taken in conjunction with his intentional misrepresentations, his denigration of their understanding of the loan documents was so outrageous as to support a finding of implied malice sufficient for an assessment of punitive damages.  On this record, an award of summary judgment to Western is inappropriate.

## III.   CONCLUSION

The Court concurs with the recommendations of the Magistrate Judge for the reasons set forth in her recommended decision and for the reasons set forth herein, and it determines that no further proceeding is necessary.

It is therefore ORDERED that the recommended decision of the Magistrate Judge (Docket # 61) is hereby AFFIRMED.  It is further ORDERED that Defendant Western Thrift & Loan's Motion for Summary Judgment or, in the Alternative, Motion for Partial Summary Judgment/Summary Adjudication (Docket # 45) is hereby GRANTED IN PART and DENIED IN PART:  Defendant Western is GRANTED summary judgment on Plaintiffs' First Cause of Action in Plaintiffs' Second Amended Complaint (Docket # 32).  Defendant Western is DENIED summary judgment on the remaining Causes of Action in Plaintiffs' Second Amended Complaint.  It is further ORDERED that Defendant's request for oral argument (Docket # 62) is DENIED.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 20th day of February, 2009